[No. 1681.]

SMYTHE *alias* W. P. MARTIN *v.* THE STATE.

1. HORSE THEFT.— INDICTMENT in this case charged the defendant with the theft of "an animal of the horse species." *Held*, sufficient to charge the offense of horse theft, though reprehensible as a criminal pleading. See the opinion *in extenso* for the animadversion of this court upon such pleading.

2. PRACTICE — CONTINUANCE — EVIDENCE.— See the opinion *in extenso* for desired evidence, which, in the first instance, entitled the defendant to a con-

tinuance, the application therefor disclosing the exercise of due diligence, and which, in the second instance, demanded the award of a new trial because of the refusal of a continuance.

3. SAME — ALIBI. — That evidence sought to establish an *alibi* is cumulative is no reason for its exclusion ; on the contrary, the greater the number of the witnesses to the facts establishing the *alibi*, the stronger, ordinarily, would its truth appear. The testimony of the absent witness in this case was material to the defense, and was desired to prove an *alibi*, and therefore did not come within the objection that it was merely cumulative.

4. SAME — PRACTICE IN THE COURT OF APPEALS. — Though this court will not revise the action of a trial court in refusing a continuance unless it appears from the evidence adduced on the trial that the testimony of the absent witness is not only material, but that it was probably true, still, when it does appear that such absent testimony was material and probably true, and that due diligence has been used to obtain it, this court will grant the defendant a new trial. See this case in illustration.

APPEAL from the District Court of Llano. Tried below before the Hon. J. C. Townes.

The conviction in this case was for the theft of a horse, the property of James Coursey, in Llano county, Texas, on the 20th day of March, 1883. A term of ten years in the penitentiary was the punishment assessed by the jury.

James A. Coursey was the first witness for the State. He testified that about the time mentioned in the indictment he owned the roan horse for the theft of which the defendant was being tried. Witness fed the said horse at his house in Llano county, Texas, on the night of March 21, 1883, and turned him out on the range. Witness first missed his said horse on the next morning, March 22, 1883. Within the next two or three weeks, witness received information that the horse was in Travis county, some little distance below the city of Austin. Witness went to Travis county in May, 1883, and found his horse in the possession of one Thomas Gatlin. The witness and Gatlin went from Gatlin's place to Austin, and showed the horse to P. A. Cox. Cox identified the horse as one he had sold to Gatlin. Witness took the horse home with him. No one had the witness's consent to take or use the horse.

P. A. Cox was the next witness for the State. He testified that he lived at Austin, Texas. He was acquainted with the witness J. A. Coursey, and knew, or at least had seen, the defendant. He first saw the defendant at his, the witness's, place of business in the city of Austin, on the 22d day of March, 1883. On that day the defendant brought a red roan horse to the witness's stable, which horse he offered to sell to the witness. Defendant remained about the stable until March 24, when the witness purchased the horse

from him, paying him $55, and taking a bill of sale, signed "W. P. Martin," the name claimed by the defendant when he first came to the stable. The witness, after his purchase, sold the horse to Thomas Gatlin. Some two or three weeks after the sale of the horse to Gatlin,— in April or May — Gatlin and Coursey came to the witness's stable in Austin, bringing with them the horse testified about. The witness next saw the defendant in the Llano county jail.

Cross-examined, the witness testified that he was in the horse business, and was the proprietor of a feed stable and wagon yard on West Pecan street, Austin, Texas. His business was quite active, a great many people coming and going, and buying horses from him, and selling to him, constantly. The witness could not undertake to say that he knew, or would again know, all parties from whom, in the course of his business career, he had purchased horses. The witness had never, to his knowledge, seen the defendant before he came to the stable on the 22d day of March, 1883, nor did he see him again until he saw him in the Llano county jail, some nine months afterwards. When the witness was brought to Llano county as a witness against the defendant, he, the witness, went to the jail to ascertain whether or not he could identify the defendant. Witness knew at that time that the defendant was in jail. A ranger went to the jail with the witness. There were at that time but two prisoners in the jail, only one of whom rose from his seat. When witness spoke to them, he thought he recognized the defendant, but could not positively swear to that effect. Witness only looked into the cell through the grates. He could see the prisoner's face, but did not notice his clothing, and did not know whether that prisoner wore shoes at the time, or was barefooted. It was quite dark in the jail, but light enough to see individuals. Witness did not afterwards see the defendant until the present term of the court. The witness positively knew that the defendant on trial was the same man who, as W. P. Martin, sold him Coursey's horse. Witness was with him two or three days before concluding the sale, and could not be mistaken.

Ed. Payton testified, for the State, that, on the 22d or 23d day of March, 1883, at about noon, the defendant, riding a blue roan horse, passed him at a point in Travis county about twenty miles northwest from Austin. He was traveling towards Austin. Witness at that time recognized the horse he was riding as a horse that belonged to Jim Coursey. Coursey lived distant from Austin some sixty-five or seventy miles. Witness had known the horse for some time.

Cross-examined, the witness said that he had never seen the defendant to his knowledge, prior to the occasion referred to in his testimony in chief. He had no personal acquaintance with him whatever. Although he looked closely at the defendant at the time, he directed his attention very closely to the horse. Witness did not again see the defendant until he saw him in the Llano county jail, some three or four months later. Witness, at the time he saw the defendant in possession of the horse, asked him nothing concerning the animal, though he knew then that the animal belonged to Coursey. The defendant on that occasion rode up to where the witness had made a camp-fire. He was ordinarily dressed, and wore a mustache and a little beard. His beard was then perhaps ten days old. No other person was present at this interview, which lasted perhaps ten or fifteen minutes. Witness did not, after his return home, tell Coursey about seeing his horse in the possession of this stranger, nor did he send him word, though the witness and Coursey lived within five miles of each other. Witness could give no reason for not having given Coursey this information. He did, however, mention the fact to Click. When the witness saw the defendant in jail, some three months after the theft of the horse, he thought he recognized him as the man he saw riding the horse on the occasion mentioned. He believes now that the defendant is the same man, though he is not sufficiently certain to make such statement positively. Before going to the L'ano county jail, witness was notified that the man who stole Jas. Coursey's horse was in that jail, and that the purpose of his visit was to see if he could identify him as the man who was in possession of that horse on May 22, 1883. Only two men were confined in jail at the time of this visit. Witness told the deputy sheriff that one of those men looked like the man he saw in possession of Coursey's horse on the day mentioned, but that he was not certain that he was the identical man. Witness made this visit to the jail on a clear sunshiny day. He only saw the two prisoners through the grates of the cell. While very confident that the defendant and the man he saw riding Coursey's horse on May 22, 1883, are one and the same man, witness declined to make such positive statement under his oath.

James Coursey was recalled by the State, and testified that, if he ever saw the defendant before his arraignment in court, he did not know it. He did not see the defendant in his neighborhood at any time shortly before or after he missed his horse. State rested.

Mrs. A. Smythe was the first witness for the defense. She testi-

fied that the defendant was her son, and that his name was Culver C. Smythe. In March, 1883, his residence was where it now is, near Willow City, in Gillespie county. The witness then, as now, lived near Wolf's Crossing in Burnet county. Defendant employed his time during the year 1883 working his own crop in Gillespie county, and aiding the witness with hers in Burnet county. He left the witness's house in Burnet county, to go to Gillespie county, on March 15, 1883, and remained until March 20, 1883. He was at the witness's house in Burnet county on and during the night of March 21, 1883. On the evening of March 22, 1883, he left witness's house to go to Llano county in search of a mule. He was then in company with W. B. Mullins, and rode a bay horse called Jim. He had no other horse at that time. He returned to witness's house in Burnet county about 8 o'clock on Sunday night, March 25, 1883. E. Ruketson, W. B. Mullins and witness's family were at the witness's house on the nights of March 21 and 22, 1883, at the time that the defendant was there.

On her cross-examination, the witness stated that she had received no written communication from the defendant during the last forty-eight hours, and had seen no letter or note written by him. The witness was at home on the 24th day of March, 1883, but knew nothing of any one bringing the defendant's saddle and bridle to her house. Corn planting on the witness's place was begun on the morning of March 21, 1883, and continued until the morning of the next day, which was March 22. On the evening of that day, the defendant left witness's house to hunt his mule, and returned on the night of the 25th, about 8 o'clock. The 18th and 25th days of March came on Sunday. The 22d of the same month came on Thursday. The 2d day of April came on Monday, and the last day of February came on Wednesday. Witness had not examined a calendar for dates. She had received no recent note from the defendant, nor had she seen or heard one read.

Mon. Turner testified, for the defense, that on the 25th or 26th day of March, 1883, he saw the defendant near Sandy Creek about sixty miles from Austin. This was either on Saturday, Sunday or Monday. Defendant was riding a bay pony, and said that he was hunting a mule. He told the witness then that he was going to Wolf's Crossing in Burnet county, and left the witness going in that direction.

Mrs. Effie Smythe testified, for the defense, that she was the wife of the defendant, and had been married to him between three and four months. She saw the defendant about the time that he is

charged to have stolen Coursey's horse. When that theft is alleged
to have been committed, the defendant was at the house of the wit-
ness's mother, near Willow City, Gillespie county, a point distant
about eighteen miles from Fredericksburg. The defendant at that
time was clearing ground and making a crop in Gillespie county.
He spent his time working his own crop in Gillespie county, and
his mother's crop in Burnet county. He was at the house of the
witness's mother from the 1st to the 9th of March, 1883. He left
on the last named day and returned on the 16th, remaining over
the 17th, 18th and 19th. On the 20th he left to go to his mother's
house in Burnet county. The fact that school had just opened im-
pressed these dates upon the witness's mind. He returned to wit-
ness's mother's house on March 23, 1883, and remained until the
afternoon of Sunday (Easter), March 25, taking Easter dinner with
witness. He then left for his mother's place near Wolf Crossing,
twenty-five miles distant. When in Gillespie county, the defendant
made his home at the house of the witness's mother.

Cross-examined, the witness stated that the defendant was alone
when he returned to her house from Burnet county on March 23,
1883. The defendant was at the witness's house during part of the
month of April, 1883, but witness could not say that he was there
on the first, second or third days of that month. The witness's
step-father opened school on the 12th day of March, 1883. The
defendant reached witness's residence on the 16th of that month.
He was there, and took Easter dinner on Sunday, March 25th.
Witness had not examined an almanac to refresh her mind as
to dates. Defendant left after dinner on March 25, 1883, riding
a dun horse, going towards his mother's house, in Burnet county.
Witness did not know where the defendant was on the 27th day of
March.

James Coursey was next introduced by the defense. He testi-
fied that he lived some ten or eleven miles from Wolf's Crossing,
and some eighteen or twenty miles from Willow City. Witness
thought his house was nearly on a line from one place to the other;
at least, not more than five miles off from the road leading from
Wolf's Crossing to Fredericksburg. Witness could not say that
Willow City was on that road. He did not know.

A. L. Smythe, the brother of the defendant, testified in his behalf
that in March, 1883, he, witness, lived at Wolf's Crossing, in Burnet
county, Texas. He lived at present three miles from Willow City,
in Gillespie county, near the Burnet and Fredericksburg road. The
defendant lived about two miles from said road. The defendant

came to his mother's house, at Wolf's Crossing, in Burnet county, on the evening of March 20, 1883, and remained there until the evening of March 22, when he left with W. B. Mullins. He returned alone, riding a dun horse, on the night of March 25. Defendant at that time owned three horses; two bays and a dun.

Cross-examined, the witness stated that the distance from defendant's place in Gillespie county to Wolf's Crossing in Burnet county was about twenty-five miles. Witness did not know who brought the defendant's bridle, saddle and blanket home on the night of March 25, 1883. Those articles had been loaned by the defendant to Isom Whitley, who lived at Wolf's Crossing. Defendant rode witness's saddle to Gillespie county.

Re-examined, the witness said that he did not see the defendant lend his saddle to Whitley. Witness was at home on March 22, 23, 24 and 25. Witness went with his mother as far as old man Reynolds's place on Saturday, March 24, and was of impression that his mother went on to church on that day. Witness did not go to church. Either Lot or Lum Talley preached on that Saturday. Defendant helped witness plant corn on the 21st and part of the 22d days of March, at Mrs. Smythe's place. In going from Wolf's Crossing in Burnet county to Willow City in Gillespie county, one would travel the Burnet and Fredericksburg road. Defendant lived about a mile off that road. From the 1st to the 16th of March, 1883, the defendant was at his mother's house in Burnet county.

Mrs. Effie Smythe, recalled by the defense, testified that the defendant left her house in Gillespie county on Easter Sunday evening, March 25, 1883. He rode a white knobbed, brownish colored saddle, and a dun colored horse, for which he had traded in February. Defendant had previously owned a black saddle. Witness did not know how long he had owned the brown one. Defendant was at witness's house from about February 15, until March 9. He left on the 10th and returned on the 16th, and remained until the 20th, when he went to his mother's at Wolf's Crossing in Burnet county.

The State introduced P. A. Cox in rebuttal. He testified that he purchased the horse from the defendant on March 24, 1883. He, defendant, then had a black leather saddle.

The application for continuance alleged that, by the absent witness Mullins, the defendant could prove his presence at his mother's house in Burnet county at the time of the alleged theft, and that by competent evidence he could account for his whereabouts elsewhere than, as he was informed, the State's evidence would locate him, from early in the evening of March 20, 1883, on the night of which the

said horse is charged to have been stolen, until March 25, 1883, which was subsequent to the alleged sale by the defendant in Austin on March 24, 1883.

The questions discussed in the opinion were raised on the motion for new trial.

*W. T. Dalrymple*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. This conviction was had upon an indictment which charges the defendant with the theft of "an animal of the horse *species*." The proof shows that the subject of the alleged theft was a *horse*. Why the pleader did not describe the property stolen simply as a *horse* "passeth our understanding." Perhaps he was experimenting to ascertain how closely he could approach to the pitfall of bad pleading without falling into it. But, whatever may have been his reason for this novel form of description, it is a form not to be commended for its simplicity, however correct it may be in the technology of zoologists. While the pleader, by this unique allegation, has put himself and the courts to unnecessary trouble, still, we think, the indictment narrowly escapes the attack made upon it, and must be held sufficient.

In zoology, the horse is a *species* of the *genus equus*. This *genus*, according to modern naturalists, consists of six distinct, though nearly allied *species*, namely, the horse, the dzeggithia, the ass, the quagga, the mountain zebra, and the zebra of the plains. (14 Encylopedia Brittanica, p. 199.) If the indictment had described the property as "an animal of the horse *genus*," it would unquestionably have been bad, for this would have included an animal of either of the six species of the *genus equus*. But instead of the word *genus*, it uses the word *species*, which means "a sort, a kind, a class subordinate to a genus " (Webster's Primary Dictionary), while the word *genus* signifies "a class embracing many species." (Ibid.) The expression "an animal of the horse species" would, therefore, only include the animals known as stallions, geldings, mares, fillies and colts. It would not include any animal belonging to a distinct species, though of the same genus. As commonly understood, therefore, that is as defined by the standard lexicographers, and as taught in our common schools, the language used by the pleader includes a stallion, a gelding, a mare, a filly, a colt, — in short a *horse*, and nothing more nor less. Our statute provides that " when it becomes necessary to describe property of any kind in an indictment, a gen-

eral description of the same by name, kind, quantity, number, and
ownership, if known, shall be sufficient." (Code Crim. Proc., art..
427.) "An animal of the horse species" is a general description of
a *horse* — of the *kind* of property alleged to have been stolen, and
the same is also further designated in this indictment by the allega-
tion of ownership. We are of the opinion that the exceptions to
the indictment were properly overruled.

II. In this case the defense was an *alibi*. The State proved by
two witnesses that the defendant was seen in possession of the stolen
horse the day after the theft. One of the witnesses purchased the
horse from him, and is quite positive that the defendant is the
identical man who sold him the horse, though he had never seen
the defendant before that time, and did not see him again until after
the lapse of nine months. The other witness did not identify the
defendant so positively as did the first, but said he was satisfied that
he was the same man that he saw in possession of said horse;—he
did not know the man, but knew the horse; had never seen the
man before, and did not see the defendant until four months after
the occasion when he saw him, as he supposed, in possession of the
horse.

The defendant proved by his mother, wife and brother, facts
which constituted a complete *alibi*, and the testimony of his mother
and brother also showed that one W. B. Mullins was also cognizant
of the facts which constituted the *alibi*. Defendant made applica-
tion to continue the cause on account of the absence of Mullins, by
whom, he stated, he expected to prove an *alibi*. His application
showed that he had used legal diligence to obtain the testimony of
this witness, and the showing of diligence was not controverted.
The court refused the continuance, and refused a motion for new
trial, one of the grounds of which was the refusal of the application
for a continuance.

We are of the opinion that the court erred in refusing the appli-
cation for a continuance, and in refusing a new trial. The testimony
of the witness Mullins was very material to the defendant, and, the
object of it being to prove an *alibi*, it does not come within the ob-
jection that it is merely cumulative evidence. "That the evidence is
cumulative, when sought to establish an *alibi*, is no reason for its
exclusion; on the contrary, the greater the number of witnesses to
the facts establishing it, the stronger ordinarily would be our re-
liance upon and conviction of its truth." (*Pinckford* v. *The State*,.
13 Texas Ct. App., 468; *Lawson* v. *The State*, Id., 264; *Tyler* v. *The*
*State*, Id., 205.)

Besides, this witness Mullins was in no way related to the defendant, and was apparently a disinterested witness, and more likely for that reason to be credited by the jury than the mother, wife and brother of the defendant. It has been laid down by this court as a rule of practice, that it will not revise the action of the court in refusing a continuance unless it appear from the evidence adduced on the trial that the testimony of the absent witness is not only material but that it is probably true. ( *Wooldridge* v. *The State*, 13 Texas Ct. App., 443; *St. Clair* v. *The State*, 11 Texas Ct. App., 297.) But, when it does appear from the evidence that the absent testimony is material, and is probably true, and that due diligence has been used to obtain it, this court will grant the defendant a new trial. ( *Casinova* v. *The State*, 12 Texas Ct. App., 554.)

In this case, the guilt of the defendant rests entirely upon the opinion of two witnesses as to his *identity*. Neither of these witnesses ever saw him, before they saw him in possession of the stolen horse, and never saw him again until months thereafter. One of them was only casually, and for a short time, acquainted with him, and the other one was not acquainted with him at all. Is it improbable, under these circumstances, that these witnesses are mistaken in the identity of the defendant with the man who had the horse? If Mullins were to testify that the defendant, at the time the horse was stolen, was at another place than where the theft was committed, and could not, therefore, have been the party who stole the horse, would not his testimony be probably true? Our conclusions are that the testimony of the absent witness Mullins is not only material, but that it is probably true, and that the court erred in not granting the continuance and in not granting a new trial; wherefore the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered December 3, 1884.]